UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 05 B 39333 |
| ANTHONY LIMONCIELLO and | ) | |
| ANNETTE M. LIMONCIELLO, | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |
| | ) | |
| | ) | |
| PHILLIP D. LEVEY, not individually but | ) | |
| as Chapter 7 Trustee, | ) | |
| | ) | Adv. No. 07 A 909 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Pamela S. Hollis |
| ROBERT R. ABBOTT and DELORES | ) | |
| E. ABBOTT, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on the complaint brought by Phillip D. Levey, the Chapter 7 Trustee in the underlying bankruptcy case. The Trustee seeks to avoid the September 9, 2005 transfer of 4240 North Melvina Street, Chicago (the "Real Property"), from Debtors Anthony Limonciello and Annette M. Limonciello, to Defendants Robert R. Abbott and Delores E. Abbott. The court conducted a trial on May 6 and 7, 2009, took the testimony of several witnesses, and admitted numerous exhibits into evidence. Having heard the testimony, read the exhibits and reviewed the papers filed by the parties, the court enters judgment for the Defendants.

## FINDINGS OF FACT

Anthony Limonciello has lived in the Portage Park neighborhood since 1973. He currently lives at 4233 North Melvina Street with his wife, Annette. In 2000, their neighbor John Wegner passed away. Wegner lived at the Real Property. Since Wegner's death, Anthony has taken care of the Real Property. He shovels snow there, as he does for other houses on the block, and parks his truck there. He continues to do this caretaking even though he no longer owns the Real Property. Anthony loves his neighborhood, specifically the block that he lives on, and he had ideas about building a home for his retirement on the Real Property. So he purchased the Real Property from Wegner's estate, paying $165,000 for it and outbidding another neighbor.

But Anthony's plumbing business ran into problems, and by the fall of 2005 he and his business were defending at least 5 lawsuits. He decided that he would sell the Real Property to try to generate some revenue for his business.

Around this time, he and his wife saw Delores and Robert Abbott at a Plumbing Contractors Association dinner at the Erie Café. Although Anthony did residential plumbing and the Abbotts' plumbing business was devoted to work in high-rise buildings, they knew each other casually from the PCA monthly meetings. The Abbotts' daughter Lori was present as well, and spoke with the Limonciellos about her late grandmother's house in Portage Park, which she was selling.

When Delores heard that the Limonciellos were selling the Real Property, her interest was piqued. She had lived on the northwest side of Chicago for nearly her entire life, moving to the suburban town of Elmhurst only recently. She had purchased the

home in Elmhurst for nearly a million dollars, but she was not sure that she liked the suburbs, and whether she would stay there for her retirement.

Although the Real Property was long and narrow, and the house was currently uninhabitable, it held promise for the Abbotts. Delores could build her retirement dream house in Portage Park near the neighborhood where she had grown up. Robert could build a large garage to house his car collection. Or perhaps Lori would build a house on the property, if she decided to settle in the area.

The Limonciellos had an appraisal valuing the property at $285,000, prepared by Carl Vander Woude. He was a licensed real estate appraiser, and had never met the Limonciellos until he appeared at the property to do a walk-through for the appraisal. Annette had gotten the name of an appraisal firm from a client or a vendor, and that firm had subcontracted the work to Vander Woude. Annette thought Vander Woude seemed very professional. No one informed Vander Woude as to the range of values that were expected from his work.

The property looks today as it did in 2000 when Anthony purchased it from John Wegner. The lot is 14,975 square feet, with no alley access. The house is basically a "tear-down." Anyone who wished to live on the property would need to demolish the existing house, haul away the debris, grade the property and build a new house.

Delores was aware of these drawbacks. She was also aware that by selling directly to her, the Limonciellos could avoid listing the house with a broker, and that she and Robert would pay cash added to their appeal as potential purchasers. Finally, her mother's house, which was located within a reasonable distance of the Real Property, sold for $340,000, and that was on a wider, fenced-in lot with alley access; Delores

testified that her mother's house was "no comparison" to the Real Property. Her mother's house was not a "tear down" like the structure located on the Real Property.

The Limonciellos provided the Abbotts with a copy of the Vander Woude appraisal on the Real Property. Delores decided to offer $230,000 for the Real Property. If the Limonciellos made a counteroffer, she wasn't going to respond. This was her final offer, and she considered it to be fair. Delores has never paid the asking price for a piece of real property – she comes to a conclusion about what she is willing to pay, and that's the price she offers.

The Limonciellos did not market the Real Property but accepted the Abbotts' offer, and the parties entered into a contract on August 16, 2005. On September 9, 2005, the Abbotts purchased the Real Property for $230,000.

The proceeds from the sale were not enough to keep the Limonciellos from filing for protection under the Bankruptcy Code, however, which they did on September 22, 2005.

Shortly after filing their petition, the Limonciellos filed all the documents required in a bankruptcy case, including their Statement of Financial Affairs ("SOFA"). Question 9 on the SOFA asks debtors to "[l]ist all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of the petition in bankruptcy" in the past year. The Limonciellos indicated that on August 27, 2005, they paid attorney James Pope $200, and that on September 8, 2005, they paid $2,500 to their bankruptcy counsel, Cohen & Krol.

- 5 -

The Limonciellos listed all their personal property on Schedule B. Of the $86,093.33 in listed property value, $71,008.33 consisted of proceeds from the sale of the Real Property. Therefore, besides the value of their interest in the Real Property, the Limonciellos owned personal property worth approximately $15,000. Of that $15,000, they claimed an exemption in nearly half, or $7,200. The Limonciellos owned $7,800 in non-exempt personal property, excepting the value of their interest in the Real Property.

Phillip Levey was appointed as the Chapter 7 Trustee in the Limonciellos' bankruptcy case. After reviewing the schedules and Statement SOFA, and conducting the § 341 meeting of creditors, Levey decided to hire an appraiser to take another look at the Real Property. Eventually his appraiser, Kevin Maloney, valued the Real Property at $524,000. Levey brought this lawsuit against the Abbotts, seeking to avoid the sale of the Real Property as fraudulent and demanding payment of the difference between the purchase price and Maloney's appraised price.

When he prepared his appraisal, Maloney reviewed 5 comparable sales, including two sales that closed after the valuation date of August 16, 2005. Those two sales were actually part of one transaction, a sale on a heavily trafficked street across from commercial real estate. These parcels were converted into a 24-unit townhouse development.

Each of the other three comparable sales was for a lot of slightly less than 5,000 square feet, with the potential for building one single family home, and each sold for less than $270,000.

Maloney calculated the price per square foot for each of these comparable sales and determined that applicable range of sales prices was between approximately $35 and

$50 per square foot. He decided that the Real Property should be valued at the lower end of that range, and using the $35 per square foot price, calculated the value of this 14,975 square foot property at $524,000.

Maloney was not aware of any regulations or ordinances that would prevent the development of at least two, and possibly three, new single family homes on this lot. The most likely subdivision of this 150 foot long lot, with 50 feet of street frontage, would be for the lot to be subdivided between a front parcel and a back parcel. A driveway would run along the side of the lot, providing access to the back parcel with an easement over the front lot. It would even be possible to have a third lot, although that would require a variance because at least one of the lots would be less than the required 5,000 square feet. Maloney testified that it would be a "virtual certainty" that such a variance would be granted.

Maloney concluded that with the "unprecedented market conditions" in 2005, where funding was readily available and houses were being built in "crazy locations," the highest and best use for this lot would be to subdivide it into two and possibly three parcels. On each parcel, a developer could build a new, single family house. Based on this highest and best use, the value of the Real Property on August 16, 2005, was $524,000.

The Abbotts hired their own expert appraiser, Steven Albert. He prepared his own appraisal, determining that the value of the Real Property on August 16, 2005, was $285,000. This was the same value that Vander Woude had calculated, although Albert used different comparables and different analysis in reaching his conclusion.

First, Albert testified that under the Uniform Standards of Professional Appraisal Practice ("USPAP"), an appraiser must use a 4 part test in order to determine the highest and best use for a parcel of property. Once that highest and best use is determined, only then can an appraiser reach a conclusion as to the value of a parcel of property.

The first test is whether the use is physically possible. It is physically possible to build at least one and potentially more houses on this lot. The second test asks, of the possible uses, which are legally permissible? Under the current zoning ordinances, this lot could not be subdivided into two lots with 25 feet of street frontage. Although the ordinance permits parcels to have lot frontage of 25 feet, it also prohibits subdivision where the frontage would be narrower than the predominant width of other lots on the street. According to a plat map of the block, no lot is narrower than 30 feet.

Albert concluded that it is not legally permissible to subdivide this lot, and that the only legal use is for the construction of one single family residence. He testified that it would be inappropriate to consider any other use.

Albert acknowledged that it is an appraiser's responsibility to consider whether a variance might be granted for an otherwise legally impermissible use. Sometimes variances are granted, and sometimes not. Additionally, he testified as to the costs involved in obtaining a variance, including retaining an attorney and an appraiser, compiling documentation, hiring an architect and the cost of delay. In this case, Albert concluded that it was not a reasonable expectation that two 25 foot lots would be marketable on this street because every other lot had a frontage of at least 30 feet. Without a demonstrable market appetite, the third test of whether the use is financially

feasible is not satisfied, and it is unreasonable to conclude that such use is the highest and best use.

The final test is whether a use is maximally productive. Albert acknowledged the possibility of subdividing the lot into front and back parcels, as there are two other lots on the same side of Melvina with more than one structure, and such subdivision would not require a variance. He testified, however, that all of the structures on those other lots were built prior to 1957.

Moreover, he reviewed the available maps and concluded that approximately 1% of the lots in this neighborhood had been subdivided into front and back parcels. This indicated very low demand for this type of lot subdivision. Shared access over a common driveway means decreased privacy and difficulty of access for emergency vehicles. Taking all of this into account, Albert testified that he saw no evidence of market demand for new construction of single family homes on a lot that had been subdivided into front and back parcels.

As a result, Albert determined that the highest and best use for the Real Property was for the new construction of one single family home. He compared the prices of other lots sold in the area on which the purchaser could build one new single family home. Although those sales were for lots with much less square footage than the Real Property, Albert assigned little contributory value to the Real Property's additional square footage. That extra square footage would provide the lot owner with more options for placement of the newly constructed home, possibly more privacy and more landscaping choices, but Albert testified that the additional 10,000 square feet at the Real Property did not have the

same value per square foot as the first 5,000 square feet needed for one single family home.

Albert also included a comparable that Maloney did not use in his appraisal report, for a property located at 4129 North Mobile. This property was similarly sized to the Real Property; at 58 feet by 300 feet it has slightly more square footage. The property on Mobile sold in 2003 for $265,000. Maloney testified that the sale was an aberration, concluding that the listing broker probably wasn't aware of the proper value of this property. Maloney testified that since the property sold in 26 days, "I think the broker gave it away." The price per square foot for this property was $15.23.

By contrast, Albert gave this comparable sale the most weight when he made a conclusion of value. It has a similar amount of square footage to the Real Property, in the same neighborhood, with the same zoning designation of RS-2. Although two single family homes could be developed on the Mobile property, Albert noted that no premium was paid for this supposedly favorable attribute. The market time was appropriate, because Albert's other comparables sold in less than 10 days, and he found no commentary in the public record that led him to believe this sale was aberrational.

In addition to conducting his own appraisal, Albert also reviewed Maloney's appraisal. He determined that Maloney's appraisal was poor for several reasons:

- Comparables 4 and 5 were actually one transaction, where the property was converted into townhome development. In contrast, the Real Property could only be developed as a single family residence. Using comparables with a different highest and best use was misleading;

- Comparables 4 and 5 closed after the appraisal date. Albert acknowledged that occasionally in litigation appraisals, one might use sales that closed shortly after the appraisal date. But such sales cannot affect buyers at the time of the appraisal, because those buyers are not yet aware of the sale price. Indeed, Maloney excluded more comparable sales in favor of sales that had not even taken place;

- Maloney based his opinion of value on the square footage price rather than the lump sum price, even though there is limited functional additional value to the extra square feet at the Real Property. Giving each square foot of the property the same value led to an overstatement of value;

- The lump sum prices indicate a lack of market support for a price in excess of $270,000. Only Maloney's comparables 4 and 5 sold for more, but those are not proper comparables because of the different zoning. Comparables 1, 2 and 3 allowed the construction of one single family residence, and each sold for under $270,000;

- Maloney failed to include the 4129 North Mobile property as a comparable. Using the Mobile property would have provided a new low for the range of prices per square foot;

- Building new homes by subdividing into front and back parcels is an anomaly rather than a market trend in the Portage Park neighborhood; and

- Maloney's final reconciliation used unadjusted data. Maloney included nothing in his appraisal report that would allow a reader to understand how he came to his conclusion. USPAP requires disclosure of his analysis, but he provided none.

Maloney did not provide any criticisms of Albert's appraisal.

The parties stipulated that the Limonciellos were insolvent at or around the time of the sale of the Real Property.

## CONCLUSIONS OF LAW

The underlying complaint alleges that the transfer was fraudulent under 11 U.S.C. § 548(a)(1)(A) and (a)(1)(B). Section § 548(a)(1) provides, in relevant part:

> **(a)** **(1)** The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
>> **(A)** made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

>       **(B)**   **(i)**   received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
>             **(ii)**   **(I)**   was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
>                   **(II)**   was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
>                   **(III)**   intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured . . . .

The burden is on the Trustee to prove all the elements of the fraudulent transfer statute.

### The Trustee Failed to Prove that Anthony and Annette Limonciello Sold the Real Property With the Actual Intent to Hinder, Delay or Defraud Their Creditors.

Debtors rarely admit that they intended to hinder, delay or defraud their creditors, so courts generally look to circumstantial evidence to establish such intent. Frierdich v. Mottaz, 294 F. 3rd 864, 870 (7th Cir. 2002). Courts have identified specific types of circumstantial evidence, known as "badges of fraud."

> These "badges" include: whether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became solvent at the time of the transfer.

Id., citing 5 Collier on Bankruptcy ¶ 548.04[2][b], pp. 548-26 to 548-28 (15th ed. rev.2002).

- 11 -

In this case, several badges of fraud are present:

- Anthony continued to shovel snow and park his truck at the Real Property, even after the transfer to the Abbotts;

- The Limonciellos were acquainted with the Abbotts prior to the sale;

- At the time of the sale, the Limonciellos and their business were facing at least 5 different lawsuits;

- The sale involved substantially all of the Limonciellos' non-exempt assets;

- The Limonciellos consulted and paid a bankruptcy attorney around the time of the sale; and

- The Limonciellos were insolvent at the time of the transfer.

On paper, this combination of facts properly raised the Trustee's suspicions. He was entirely correct to investigate further, and to take testimony from the parties involved in this transfer.

Although there is circumstantial evidence indicating that intent to defraud may be present, the court finds that the Limonciellos did not transfer the Real Property with the intent to defraud their creditors. The court heard testimony from Anthony and Annette Limonciello as well as from Delores and Robert Abbott. They were all credible witnesses, presenting their testimony in an honest and forthright manner. Each of the badges of fraud, when addressed, turns out not to have a sinister motive.

Anthony continued to take care of the Real Property after the sale to the Abbotts. But he testified very credibly that he takes pride in his neighborhood and specifically in his block. The Abbotts are absentee owners, and his attention to their property prevents it from becoming a nuisance or an eyesore. In return, he is allowed to park his truck at the property. This strikes the court as an appropriate arrangement, and having heard from the witnesses, an arrangement that is perfectly reasonable to them.

The parties freely admitted that they were acquainted prior to the sale, but the court finds no special relationship between the Limonciellos and the Abbotts. They are not related to each other, and do not socialize. Their acquaintance is limited to mutual attendance at Plumbing Contractors Association events.

The Limonciellos were facing several lawsuits at the time of the sale, and Anthony indicated that he hoped the sale would raise sufficient proceeds to enable him to save his plumbing business. While the Trustee noted that this sale involved substantially all of the Limonciellos' non-exempt assets, this fact means that a sale would have been Anthony's only chance to save his business outside of bankruptcy. The court finds it reasonable to conclude that at the time they discussed selling the Real Property with the Abbotts, the Limonciellos thought they could avoid filing a bankruptcy petition. But by the time the sale closed on September 9, they had already paid Cohen & Krol $2,500. Consultation with a bankruptcy attorney, however, is not sufficient to support a finding of intent to defraud.

Moreover, certain of the more nefarious badges of fraud are missing from the Trustee's case. One of the badges is whether the transfer was disclosed or concealed. Instead of concealing the transfer, the proceeds of the sale are very specifically listed on the Limonciellos' Schedule B as "proceeds from sale of 4240 North Melvina," in answer to Question 2. The Limonciellos made no attempt to hide these non-exempt proceeds from their creditors or from the Trustee, and did not try to abscond with the proceeds.

Another badge of fraud is whether consideration was exchanged. The Limonciellos had an appraisal valuing the Real Property at $285,000. The Abbotts offered and eventually paid $230,000. Whether the consideration exchanged was

- 13 -

reasonably equivalent value is discussed in more detail below, but there is no question that the Limonciellos received a significant sum of money for the Real Property, especially considering that they purchased it approximately 5 years earlier for nearly 30% less than the Abbotts paid.

Finally, the parties stipulated that the Limonciellos were insolvent at the time of the transfer. This is not surprising, as the sale occurred just 13 days before they filed for relief under the Bankruptcy Code. But the fact of their insolvency is not sufficient evidence for the court to find that the Limonciellos transferred the Real Property with the intent to hinder, delay or defraud their creditors.

For all of the reasons stated above, the court finds that the Trustee has not met his burden of proof on the question of whether the Limonciellos transferred the Real Property with intent to hinder, delay or defraud their creditors. Judgment will be entered for the Defendants on this count.

### The Trustee Failed to Prove that Anthony and Annette Limonciello Sold the Real Property For Less Than a Reasonably Equivalent Value at a Time When They Were Insolvent.

The Trustee has the burden of proving that the Limonciellos received less than reasonably equivalent value when they transferred the Real Property to the Abbotts. This is all that the Trustee must prove to prevail on this count, because the parties entered into a stipulation in which they agreed that the Limonciellos were insolvent on the date of the sale.

The Seventh Circuit has instructed the lower courts that "the formula for determining reasonably equivalent value is not a fixed mathematical formula; rather, the standard for reasonable equivalence should depend on all the facts of each case, an important element of which is fair market value." Barber v. Golden Seed Co., Inc., 129 F.

- 14 -

3rd 382, 387 (7th Cir. 1997) (quotation omitted). A recent bankruptcy court from this district relied on Black's Law Dictionary to define fair market value "as 'the price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect.' Black's Law Dictionary 1587 (8th ed.2004)." In re Doctors Hosp. of Hyde Park, Inc., 360 B.R. 787, 840 (Bankr. N.D. Ill. 2007). The Barber panel also noted that "the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." 129 F. 3rd at 387 (quotations omitted).

In this case, in order to assist the court in determining the fair market value of the property, the parties each presented expert appraisal testimony on the value of the Real Property. The question of reasonably equivalent value comes down to a battle of the experts, and more specifically whether the Real Property should have been valued as having the potential for building more than one single family home.

Having heard testimony from both experts, and reviewed the appraisal reports admitted into evidence, the court concludes that Defendants' expert Steven Albert was more credible, and accepts his appraised value of $285,000 for the Real Property.

Albert's appraisal was more credible for several reasons. First, the court heard no testimony from Plaintiff's expert Maloney criticizing Albert's methodology or conclusions. While counsel for the Trustee had comments about the Albert appraisal in his closing statement, that is not evidence from an expert. There was no evidence suggesting that Albert's reasoning or process was flawed.

Second, Albert had numerous criticisms of Maloney's appraisal, which the court recited above in the findings of fact. The court found the crucial flaw in Maloney's

analysis to be his decision to give each square foot of the Real Property the same value. Maloney based his opinion of value on the square footage price of his comparables rather than the lump sum price, <u>even though there is limited functional additional value to the extra square footage</u>. This resulted in a serious overstatement of value.

The conclusion that Maloney's analysis overstated the value of the Real Property is further supported by the fact that comparables 1, 2 and 3 were all parcels that were developed into one single family house. None of those parcels sold for a price in excess of $270,000.

In order to determine that the extra square footage at the Real Property had limited additional value, and to properly compare the Real Property to the three parcels that sold for less than $270,000, the court must accept Albert's conclusion that the highest and best use for the Real Property was for the development of <u>one</u> single family home. Maloney testified first, and when the court heard his testimony, his conclusion that the parcel could be subdivided into two or even three lots seemed reasonable.

After listening to Albert's testimony, however, and considering the process he used to determine the highest and best use for the Real Property, the court finds that Maloney's assumption about the potential for subdivision was not well supported. Albert first noted that subdividing the property into side by side parcels with 25 feet of frontage was not legally permissible. Although a variance might be obtained, it is not a certainty, because the prevailing lot frontage on that street is over 30 feet.

As for subdividing the property into front and back parcels, Albert testified that only 1% of the lots in this neighborhood had been subdivided into front and back parcels. Such a subdivision would be an anomaly rather than following a market trend. Although

there were two parcels on Melvina that had front and back structures, each of those had been built prior to 1957. There was no new construction on the 4200 block of Melvina Street on a lot that had been subdivided into front and back parcels with a common driveway.

Albert also criticized Maloney's use of the two parcels that were turned into a townhouse development as comparables, especially because Maloney failed to include a much better comparable at 4129 North Mobile. The townhome parcels were part of a package sale for a different highest and best use, and comparing the sale of those parcels to the Real Property was not an apples to apples comparison. Moreover, those sales closed long after the appraisal date, so they could not have contributed to a buyer's awareness of market value at the relevant time.

Finally, Maloney included nothing in his appraisal report that would allow a reader to understand how he came to his conclusion. He used unadjusted data to determine an estimate of value without providing a reader any insight into his analysis.

For all of these reasons, the court finds that Albert's appraisal, which valued the Real Property at $285,000, as Vander Woude had done, to be the appropriate conclusion of fair market value.

Having concluded that the fair market value of the Real Property on August 16, 2005, was $285,000, the court must then determine whether the purchase price of $230,000 was less than reasonably equivalent value. As the Circuit noted in Barber, "the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." Although the Abbotts paid approximately 20% less than the appraised value for the Real Property, this was a cash deal accomplished without a broker.

All four parties involved in the transaction testified, and all four were credible witnesses. The motives they provided to explain their actions -- why the Limonciellos were selling the Real Property, and how the Abbotts arrived at the amount of their offer -- were reasonable. The demeanor of each of these parties was honest and forthright, and the court had no sense that they were dissembling. They relied on an appraisal provided by a third party who none of them knew, and consummated a transaction that had some benefit for each one of them. As a result, the court concludes that although the Abbotts paid $230,000 for the Real Property, rather than the fair market value of $285,000, they provided reasonably equivalent value.

For all of the reasons stated above, the Trustee has not met his burden of proof on the issue of whether the Abbotts' purchase of the Real Property for $230,000 was for less than reasonably equivalent value. Judgment will be entered for the Defendants on this count.

Date: **MAY 1 9 2009**

PAMELA S. HOLLIS
United States Bankruptcy Judge